[Cite as *State v. Gordon*, 2011-Ohio-5738.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

  PLAINTIFF-APPELLEE,     CASE NO. 12-10-04

  v.

FOREST L. GORDON,       O P I N I O N

  DEFENDANT-APPELLANT.

STATE OF OHIO,

  PLAINTIFF-APPELLEE,     CASE NO. 12-10-05

  v.

FOREST L. GORDON,       O P I N I O N

  DEFENDANT-APPELLANT.

Appeals from Putnam County Common Pleas Court
Trial Court No. 2009 CR 00019

Judgments Reversed and Causes Remanded

Date of Decision:  November 7, 2011

APPEARANCES:

  *F. Stephen Chamberlain* **for Appellant**

  *Ken Egbert, Jr.* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-Appellant, Forest L. Gordon ("Gordon"), appeals the judgments of the Putnam County Court of Common Pleas finding him guilty of two counts of theft in office. On appeal, Gordon claims that the jury's decision was against the manifest weight of the evidence; that there was insufficient evidence to prove he utilized his office to facilitate the commission of the offenses; and that the trial court abused its discretion when it sentenced Gordon to more than minimum sentences for his first criminal offense. For the reasons set forth below, the judgments are reversed.

{¶2} Gordon was Chief of Police of the Village of Kalida from May 10, 2002 through July 25, 2007. On July 26, 2007, Gordon began serving as the Assistant Chief of Police for the Village of Ottawa, although he also continued working as a part-time police officer or "acting chief" for Kalida until October 12, 2007, when a new police chief, Michael Giblin ("Chief Giblin"), was hired. Beginning January 1, 2008, Gordon served as the Chief of Police for Ottawa until his termination on January 28, 2008,

{¶3} Gordon was indicted on two counts of Theft in Office, in violation of R.C. 2921.41(A)(1), involving charges in two separate cases which were combined for trial and appeal. Case No. 9-CR-19, appellate case No. 12-10-04 (hereinafter "the Ottawa firearms case"), involves the sale of firearms that

belonged to the Ottawa Police Department.  The State claimed that in 2006, Gordon sold several firearms without permission, including firearms from the evidence room and former service weapons, and only gave the Ottawa police chief a portion of the money he received from the sales.  The second case, Case No. 9-CR-40, appellate case No. 12-10-05 (hereinafter "the Kalida property and services case," or "the Kalida case") dealt with three different matters in which the State maintained that Gordon:  (1) deprived Kalida of ten hours of his services when he used the police department's computers for non-work related purposes, specifically Internet "sex chat" sessions; (2) overcharged two fellow Kalida police officers for handguns purchased through a lease/purchase agreement with Smith & Wesson; and (3) failed to return personal police equipment when he left Kalida's employ.[1]

{¶4} Gordon entered pleas of not-guilty in both cases and a three-day jury trial was held in January 2010.  The State presented testimony from numerous witnesses, including Chief Giblin; Richard Knowlton ("Chief Knowlton"), Ottawa's Chief of Police prior to Gordon, who then became the Safety Director of Ottawa; and Sammy Justice ("Agent Justice"), the special agent in the Major Crimes Division of the Ohio Bureau of Criminal Identification and Investigation

---

[1] There were also allegations and considerable testimony at trial that Gordon transferred an M-16 assault rifle belonging to Kalida to Ottawa without executing the necessary documents for the transfer.  However, this was not a part of the indictment, nor included in the jury charge.  Moreover, although at least five witnesses testified concerning the M-16 rifle, they all gave very different and conflicting accounts concerning what had occurred.

("BCI"), who was called upon to conduct the investigation. Numerous other police officers and village officials from Ottawa and Kalida also testified, along with individuals and gun store proprietors involved in the purchase and sale of the firearms involved in this case.

{¶5} Gordon testified in his own defense and denied any wrong-doing. Concerning the Ottawa firearms case, Gordon testified that Chief Knowlton gave him some unused service weapons and several old firearms from the evidence room and asked that he try to sell them to raise money for special drug programs that Ottawa wanted to implement. Gordon had once been a gun dealer, so he thought he could help his friend, Chief Knowlton, raise extra money by disposing of these old weapons. Gordon insisted that he gave Chief Knowlton all of the money that he received from the sale of the guns.

{¶6} As to the Kalida case, Gordon denied that he was the person who participated in the Internet instant message ("IM") conversations, testifying that at least nine or ten other Kalida police officers and employees had access to the computers; that everyone using the computer logged onto the one account that was set up in the name of "Forest Gordon"; that the account was not password protected; that the dates and times on the computer print-out logs might not be accurate because they were dependent upon the time/date settings on the computer, which could easily be changed; and that he did not use any of the screen

-4-

names that were found in the "chat room" conversations.[2] Gordon further denies any "theft of time" from Kalida when using the computer because he testified that he was a salaried employee with no specific hours and that he was technically available for duty all the time, "24/7," and would often come to the office on his own time and use the computer for his own personal training and other purposes.

{¶7} Gordon also testified that he did not intend to overcharge the two Kalida police officers for their weapons and that he only charged them their share of what he believed to be the list prices of the guns on the lease/purchase program. He denied "pocketing" any extra money and testified that he sent all of the funds he received from the officers to Smith & Wesson for each quarterly lease payment.

{¶8} Lastly, Gordon claimed that he returned all of the uniforms and equipment that he believed to be Kalida's property when he left his employment. However, the State issued a search warrant and found some additional equipment at his home. Gordon testified that the holsters and leather equipment belts belonged to him because he had received some of them during his employment with other police departments prior to working for Kalida and that he had purchased some of this equipment himself through the Village of Kalida. He acknowledged that the body armor (a bulletproof vest) belonged to Kalida and should have been returned, but testified that it was in the back of his closet, he

---

[2] The State claims that Gordon admitted to participating in some chat room sessions. (Appellee's Br., p. 6.) However, this misrepresents his testimony. Gordon acknowledged that he had participated in some Internet chat sessions when they were undergoing training concerning online sexual predators.

hadn't used it in years, and he had forgotten that it was there. If Kalida would have reminded him that he still had it or asked that it be returned, he would have immediately given it back. He believed the $31 car battery charger belonged to him, but again, he would have been happy to return it if it was truly Kalida's property.

{¶9} After hearing all the evidence, the jury returned a verdict of guilty on both counts. The Ottawa firearms case was a felony of the fifth degree because the jury found that it involved the theft of property valued at less than five hundred dollars. The Kalida case was a felony of the fourth degree, with the jury finding that it involved property "valued at more than five hundred dollars, but less than five thousand dollars."

{¶10} On March 26, 2010, the trial court sentenced Gordon to nine months in prison for the Ottawa firearms case and twelve months for the Kalida property case, with both sentences to be served concurrently. The trial court also ordered Gordon to pay restitution and costs and informed him that he would not be permitted to hold any positions of public trust thereafter. In the Ottawa Firearms case, Gordon was ordered to pay $485 in restitution to Ottawa. The restitution ordered in the Kalida property and services case was as follows: $57.80 and $233 to Officers Weaks and Strick for the gun lease overcharge, and $1,221.48 to the Village of Kalida. Gordon was released on his own recognizance pending appeal.

{¶11} Gordon now appeals these judgments and presents the following three assignments of error for our review.

### First Assignment of Error

**The trial court committed error in that [Gordon's] conviction was against the manifest weight of the evidence presented at trial and the jury clearly lost its way.**

### Second Assignment of Error

**The trial court committed error in that there is a lack of nexus between the public office held by [Gordon] and the facilitation of the crime of theft that precludes conviction on the specific offense of theft in office as to Case No. 09-CR-19 in the trial court below.**

### Third Assignment of Error

**The trial court committed error in that it abused its discretion in sentencing [Gordon] to non-minimum terms of prison based upon the record and statement of reasons set forth by the trial court at sentencing.**

{¶12} Gordon maintains that the jury clearly lost its way and that its decision was against the manifest weight of the evidence. Gordon charges that the State presented testimony that was "unreliable, contradictory, self serving and lacking in substance" and also presented evidence that was designed to inflame the passions of the jury rather than persuade them with clear facts. Gordon also argued that there was insufficient evidence to support his conviction, and that sentencing him to non-minimum terms for a first offense was improper.

{¶13} The offense of Theft in Office, R.C. 2921.41(A), occurs when a public official commits any theft offense, as defined under R.C. 2913.01(K), and either one of the following applies: "(1) The offender uses the offender's office in aid of committing the offense ***;" or "(2) The property or service involved is owned by this state, any other state, the United States, a county, a municipal corporation, a township, or any political subdivision, department, or agency of any of them ***." The State charged Gordon under R.C. 2921.41(A)(1), claiming that he recklessly used his office to commit theft offenses in violations of R.C. 2913.02(A)(2) and/or (A)(3), which state:

> **A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:**
>
> **\*\*\***
>
> **(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;**
>
> **(3) By deception; \*\*\***

{¶14} A challenge to a conviction based on the manifest weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before

them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.*" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

{¶15} The State presented testimony from twenty different witnesses in support of its cases, along with 63 different documents and exhibits that were admitted into evidence. Sometimes several witnesses would provide corroborating testimony concerning a particular event, although there were many instances when the witnesses had different recollections as to what had occurred, or they "didn't remember" or "didn't recall." Most of the allegations against Gordon involved events that happened four or more years prior to the trial. In order to clarify the issues, we will review each count/case separately.

### Case No. 9-CR-19 – The Ottawa Firearms Case

{¶16} The State claimed that Gordon sold several older firearms from Ottawa's evidence and property rooms, without permission, and that he did not give Chief Knowlton all of the money he received from the sale of these weapons. Gordon, however, insisted that Knowlton gave him the guns with the expectation that Gordon would sell them. Gordon also claimed that he gave Knowlton all of the proceeds from selling the weapons.

{¶17} Chief Knowlton acknowledged that sometime around late 2005 or early 2006, he gave Gordon several older and unused firearms from Ottawa's

property and evidence rooms. However, he testified that he only expected Gordon to clean them up and get an estimate as to what they might be worth. He claimed he was shocked and surprised when Gordon sold them and gave him $900 from the sale of the firearms. The Ottawa municipal director, Jack Williams, testified that he was very upset when he learned that the weapons had been sold because that was not the proper procedure for disposing of property. There was conflicting testimony concerning the amount of money Gordon received from four different sales of Ottawa's firearms in January 2006.

{¶18} In his first assignment of error, Gordon argues that the trial court's decision was against the manifest weight of the evidence because the testimony concerning the gun sales was confusing and contradictory and that there was no definitive evidence that Gordon did not have permission to sell the guns. However, because Gordon's second assignment of error is dispositive of this issue, we shall address it first.

{¶19} In Gordon's second assignment of error concerning the Ottawa firearms case, Gordon argues that there was not sufficient evidence that Gordon used his position as an officer with the Village of Kalida in committing the offense pursuant to R.C. 2921.41(A)(1). Conviction for theft in office under this section requires both that the defendant was a public official and that he or she used his or her office in aid of committing the offense. Id. Gordon acknowledges that, as a

police chief, he was a public official, and he does not contest that the facts alleged constituted a theft offense. However, he argues that the fact he was a police officer was only peripherally related to the alleged theft and he did not "use" his office in committing a theft offense.

{¶20} Gordon cites *State v. Bowsher* (1996), 116 Ohio App.3d 170, 687 N.E.2d 316, for the proposition that there must be some "palpable nexus between the auspices of the office and the wrongdoing" before a defendant can be convicted of "theft in office." Id. at 175. In that case, the defendant, Gary Bowsher, was a Toledo police officer who was also the volunteer treasurer of a police-firefighters organization which sponsored "guns and hoses" golf tournaments to raise money for charity. The charitable organization was not affiliated with the Toledo Police Department in any way, but the officer solicited and collected funds for these events and as treasurer of the organization. The officer took money from this fund and converted it to his own use. As a result, he was charged with Theft in Office under R.C. 2921.41(A)(1), which provides that "No public or party official shall commit any theft offense, *** when either of the following applies: (1) The offender uses the offender's office in aid of committing the offense or permits or assents to its use in aid of committing the offense[.]" Id.

{¶21} As in this case, the defendant in *Bowsher* also contended that the fact he was a police officer was only peripherally related to the alleged theft. *Bowsher*

at 174. The state argued that had he not been a police officer, he would not have been involved with a police-firefighters charity, he would not have had access to an account at the Police Credit Union, and he could not have collected funds for charity while in uniform, on duty, and in a Toledo police vehicle.

{¶22} The court of appeals reversed the officer's conviction, finding that a tangible nexus was missing between the defendant's official duties as a police officer and the crime charged. Id. at 175, citing *State v. Sakr*, (1995), 101 Ohio App.3d 334, 655 N.E.2d 670. The court found that the officer did not take public funds nor public property. And, the fact that he had solicited the funds while in his police uniform had little, if any, relationship to when he *later* improperly withdrew $211 from the fund's account. Id. And finally, the court cited "the time-honored maxim that criminal statutes should be narrowly construed against the state." Id. at 176, citing *State v. Young* (1980), 62 Ohio St.2d 370, 374, 406 N.E.2d 499, 502.

{¶23} As in *Bowsher*, the theft offense in this case had nothing to do with Gordon's job and duties as a police chief of Kalida; in fact, it had nothing to do with the Village of Kalida at all. Gordon claimed he was merely doing a favor to help a friend, who just happened to be a fellow police officer. Chief Knowlton testified that he and Gordon were friends, and he knew that Gordon was someone who was familiar with guns. The fact that he was a fellow police officer may have

had a peripheral relationship to Chief Knowlton and Gordon working together. However, just as in *Bowsher*, Gordon's position was not in any way related to the actual alleged theft offense. Furthermore, Chief Knowlton and the Village of Ottawa must not have thought that Gordon's actions in taking guns and selling them was wrong or criminal in any way because Chief Knowlton later hired Gordon to succeed him as Ottawa's police chief *after* Gordon had sold the guns. Chief Knowlton's actions in finding Gordon trustworthy enough to hire further demonstrate that there was a separation between the alleged act of theft and Gordon's position as a police officer.

{¶24} The State argues that the facts in *Bowsher* are distinguishable because the officer did not take any public funds or property whereas in this case, the firearms and funds obtained from their sale were the public property of the Village of Ottawa. However, the State chose to indict Gordon *only* for a violation of R.C. 2921.41(A)(1). It did not charge Gordon under R.C. 2921.41(A)(2), for a theft offense where "[t]he property or service involved is owned by this state, any other state, the United States, a county, a municipal corporation, a township, or any political subdivision, department, or agency of any of them ***." The State chose its theory of the offense at the time of the indictment. The State never argued at trial that section (A)(2) was applicable in this matter.

{¶25} Gordon did not have to be a police officer to obtain the firearms from his friend, Chief Knowlton, nor did he have to be a police officer to sell the firearms to third parties. And, whether or not he accurately accounted for all of the funds he may have received was in no way related to his position as a public official. Therefore, the nexus between the wrongdoing and the public office is nonexistent.[3] Gordon's second assignment of error is sustained pertinent to his conviction in the Ottawa firearm's case no. 9-CR-19, appellate case no. 12-10-04. This renders Gordon's first assignment of error in the Ottawa firearm's case moot, and it need not be addressed.

### Case No. 9-CR-40 -- The Kalida Property and Services Case

{¶26} This count in the indictment alleged three completely different instances of wrong-doing.[4] Because the three separate acts involved different facts

---

[3] The Dissent has gone to great detail in laying out why Gordon might have been convicted under R.C. 2921.41(A)(2). However, Gordon was indicted under R.C. 2921.41(A)(1). The sale of the guns from Ottawa (along with the sale of Chief Knowlton's wife's personal pistol, which was included in the lot) was not in any way related to his duties or job responsibilities with Kalida and he was not being paid to do this by Kalida. Gordon apparently volunteered to clean up the old guns, take them to gun dealers, obtain estimates, etc., as a favor for his friend, Chief Knowlton (no mention of compensation for his time was in the record). As in *Bowsher*, the mere fact that the people involved knew that Gordon was a police officer was only a peripheral matter and did not create a sufficient, tangible nexus between Gordon's official duties and the alleged offense in order to constitute a "use" of office under R.C. §2921.41(A)(1). *Bowsher*, 116 Ohio App.3d at 174-75. See, also, *State v. Sakr*, supra. Although *Sakr* is distinguishable because it dealt with a statute of limitations issue, the court found that the rape of a student by a state university professor did not qualify as "misconduct in office" as contrasted with "misconduct while in office but not necessarily related to that office." Id. Likewise, R.C. 2921.41 is titled and discusses "theft in office," not "theft *while in* office." Every public official who commits a crime while holding office is not necessarily guilty of misconduct in office.

[4] R.C. 2913.61(C)(3) states that "[w]hen a series of two or more offenses under section 2921.41 of the Revised Code [theft in office] is committed by the offender in the offender's same employment capacity, or relationship to another, all of those offenses *may* be tried as a single offense." (Emphasis added.)

-14-

and activities that occurred years apart, we will review each allegation individually for clarity of discussion.

{¶27} Although Gordon's arguments pertaining to these issues were included under the first assignment of error claiming that the decision was "against the manifest weight of the evidence," we find that his arguments actually raised the legal question as to whether or not there was *sufficient evidence* as a matter of law to sustain a conviction. Gordon consistently claimed that the State "failed to produce any evidence," "the record is completely lacking any evidence," and "there is no evidence," throughout his discussion of the issues raised.

{¶28} A conviction that lacks sufficient evidence of all of the elements of the offense is clearly also against the manifest weight of the evidence. However, when reviewing a case based upon the sufficiency of the evidence, an appellate court utilizes different standards. See *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198. Because we find that Gordon has set forth arguments concerning the sufficiency of the evidence in the Kalida case, we will review the decision to determine whether there was sufficient evidence to find Gordon guilty of the offense.

{¶29} When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence submitted at trial, if believed, could reasonably support a finding of guilt beyond a

reasonable doubt. See *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541, 546 (stating, "sufficiency is the test of adequacy"); *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, 503. The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jenks*, supra. This test raises a question of law and does not allow the court to weigh the evidence. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. However, where "the evidence offered by the prosecution in support of the elements of the offense charged is so insubstantial and insufficient, and of such slight probative value, that it is not proper to make a finding beyond a reasonable doubt that appellant committed all of the acts constituting the elements of the offense, a reviewing court must reverse, rather than affirm, the conviction." *State v. Fyffe* (1990), 67 Ohio App.3d 608, 615, 588 N.E.2d 137. Additionally, only a concurring majority of an appellate panel is needed to reverse a judgment based upon the sufficiency of the evidence as opposed to the unanimous concurrence of all three appellate judges necessary for a reversal based upon the manifest weight. *Thompkins*, supra.[5]

---

[5]The Constitution of Ohio, Art. IV, § 3(B)(3), requires the decision to be unanimous when an appellate court reverses a jury on the manifest weight of the evidence.

*First Allegation: Using duty time for unauthorized and improper computer use*

**{¶30}** Shortly after he took office, Chief Giblin ordered a forensic examination of the police department's two computers. The examiner testified that he found several "chat logs" from October and November 2004, showing that sexually oriented text conversations took place between persons identified as "Smith & Wesson 45," "Lonely Cop 38," Bad Angel 02," "Care Bear 4385," and others. (See Trial Exhibits 25, 32, and 37.) Furthermore, of the 15,486 images in the computer's memory, approximately 20-30 images showed adult nudity. The State compared the times Gordon was on duty with the times on the instant message chat print-outs and concluded that Gordon had deprived the village of ten hours of his services, at a rate of $15 per hour, when he was supposed to be working.

**{¶31}** Gordon denies that he was the person involved in the Internet chat sessions but he also claims that the State "failed to produce any evidence whatsoever that Gordon's alleged use of the Internet during work hours in any way deprived the Village of Kalida of services." He asserts that the record is completely lacking in any evidence that there were missed calls for service, lack of investigations, lack of enforcement of the law, or any other measures that would indicate that Gordon did not do his job. In support, he cites a recent Fifth District Court of Appeals case with similar facts wherein the court held that there was

insufficient evidence that the public employee's unauthorized use of the computer constituted theft in office. See *State v. Wolf*, 5th Dist. No. 08-CA16, 2009-Ohio-2018.

**{¶32}** In *State v. Wolf*, the superintendent of the city's wastewater treatment plant was found guilty of theft in office, unauthorized use of a computer, and solicitation after he admitted to spending over one hundred hours on the Internet, including accessing sexually oriented sites, when he should have been working. Id. As in this case, the state charged that the defendant was guilty of theft in office because he deprived the city of his services while he was engaging in the unauthorized usage of his computer. Id. at ¶69. However, the Fifth District Court of Appeals held that the trial court had erred in overruling the defendant's motion for acquittal on the charge of theft in office. The court found that there was insufficient evidence to support a theft conviction:

> **Upon review, we find that while the State presented evidence [the defendant] spent approximately 100 hours over a five month-period utilizing internet websites that were not related to his job, *there was no evidence presented that his job performance suffered or that he failed to perform his job duties.***
>
> **Furthermore, *even if* it could be shown that [the defendant] failed to perform such job duties, while it could certainly serve as a basis for termination from his employment, *such could not be the basis of a criminal theft in office charge.***

(Emphasis added.) Id. at ¶¶70-71. In a concurring opinion, Judge Hoffman stated:

> **I write separately only to voice my reluctance to accept the State of Ohio's theory [that] time not spent "about the master's business" is theft of services. I accept there may be situations where such theory applies. But to suggest it applies in situations such as the one presented herein where the employee is in the employer's workplace and completes all tasks assigned but engages in other personal matters during his or her idle time is a slippery slope. Under the State of Ohio's interpretation, a person who reads the newspaper, works the daily crossword puzzle, engages another employee in personal conversation, or merely daydreams or dozes off may be charged with theft in office.**

Id. at ¶90 (Hoffman, P.J., concurring.)

{¶33} In viewing the evidence in a light most favorable to the prosecution, we shall presume that Gordon was the person who participated in the Internet chat sessions. However, as in *Wolf*, the record in this case is also devoid of any evidence as to whether Gordon failed to perform his job duties, whether he engaged in the chat during "break" times, whether he made up the time by performing police work at other times, whether he was "on duty" and available to answer calls even though online, or whether his job performance suffered in any way. Although the State submitted evidence showing that Gordon was signed in as "on duty" during the times that most (although not all) of the "chats" occurred, there was no evidence as to how many hours he was required to work, how many hours he actually worked,[6] and whether or not he fulfilled the duties required to

---

[6]Although the State claims that there were ten hours of "chat" during a two-month period in 2004, there was also no evidence that Gordon was not working during that entire time. The exhibits showed that the conversations were of the "instant messenger" type of communication that can be active in the computer's "background" while not actually being utilized. Several of the exhibit entries showed chat sessions lasting

-19-

earn his paycheck.

{¶34} We agree that the use of Kalida's computers for this purpose was unauthorized, extremely inappropriate, and wrong. There certainly may have been sufficient evidence of highly improper conduct in order to terminate Gordon. However, if Gordon's use of the computer for personal purposes during work time constitutes theft in office, it would mean that every public official or government employee who sends a personal email, reads a text message, or checks Facebook during working hours would be guilty of committing a felony. We do not believe that is the intended purpose of R.C. 2921.41. Therefore, we find that there was insufficient evidence that Gordon's use of the Village's computers for personal purposes constituted Theft in Office pursuant to R.C. 2921.41.

*Second Allegation: Overcharging two officers for firearms lease payments*

{¶35} In the next part of the charge, the State claimed that Gordon overcharged Kalida Police Officer Troy Weaks and Officer Joshua Strick by $57.80 and $233.60, respectively, for lease-purchase payments the officers were making (along with Gordon) in order to purchase their service revolvers. Based upon the calculations presented by the State at trial, Gordon acknowledges that the amount he charged Officer Weaks and Officer Strick for their share of the firearm

---

over an hour, but only a few words or comments were exchanged during that time. Furthermore, the chats did not occur as a result of Gordon accessing pornographic websites as alleged – they were conversations between two people, who appeared to know each other, utilizing IM services such as Yahoo Messenger, and others. While some of the exchanges were sexually oriented and explicit, other exchanges were merely general conversations as to what the parties were doing, plans for the weekend, etc.

lease/purchase plan was incorrect, but by a relatively small amount. However, Gordon claims that this was simply an inadvertent error that was made in calculating the payments and that there was no evidence of any criminal intent that he acted with a purpose to deprive these officers of their property.

{¶36} A person acts purposely when it is his specific intention to cause a certain result. R.C. 2901.22(A). While we give great deference to the decisions of the fact-finder who is present in court at the time of the testimony, an appellate court has the vantage point of being able to sift through all of the transcripts and exhibits, re-read all of the testimony, and carefully compare the testimony to the exhibits and evidence. Even in construing the facts in favor of the prosecution, we did not encounter any evidence from which a fact-finder could infer criminal intent.

{¶37} In fact, we cannot be certain that the jury actually *did* find that Gordon was guilty of theft in office for his actions pertaining to the Smith & Wesson lease. Because all three instances of Gordon's wrong-doing were combined into one count, there was no way of knowing if the Jury's verdict meant that they found sufficient evidence of guilt for *all three* of the separate portions of the charged offense, or only two, or just one of them.

{¶38} The Village of Kalida, which has about 1,000 people, did not have the funds to provide its police officers with handguns. Therefore, as he had done

in the past, Gordon arranged a lease/purchase program with Smith & Wesson whereby he and the other two officers could purchase their own handguns by making quarterly payments over a two-year lease period, with a one-dollar buy-out at the end. Gordon was purchasing four handguns, and Officers Weaks and Strick were each purchasing one. Although the three men were purchasing these weapons for themselves, the lease listed the Kalida Police Department as the "lessee/customer" and no sales tax was charged. The officers testified that they thought that this was a good arrangement whereby they could purchase their guns via a type of "payment-plan" and would then own their own weapons at the end.

{¶39} The lease agreement with Smith & Wesson and its "Appendix A" listed the total price for the six guns as $3,557.27, at an interest rate of 8%, with $484.90 to be paid quarterly for two years. The lease and its attached appendix contained a list of the six guns (four different models) with their serial numbers, but did not contain any individual pricing for the individual guns or models. Therefore, in order to figure out how much each officer should pay, Gordon testified that he contacted the Smith & Wesson representative.

> **Q. Now, when you figured up the amounts that each of you guys were supposed to pay for your share of the lease payments, how did you do that?**
>
> **Gordon: I contacted the regional law enforcement sales director.**

**Q. OK, you can't tell anybody what he said,[7] but what did you do as a result of that contact.**

**Gordon: Troy Weaks, Josh Strick and I looked up the prices on the law enforcement version of [the Smith & Wesson] website and obtained the list prices off of there, divided them by eight, and that became their payments.**

**Q. All right. So that's how you figured up those particular amounts?**

**Gordon: Yes.**

(Trial Tr., Vol. III, p. 123.)

{¶40} The testimony of the other two officers confirmed this arrangement. Officer Weaks stated that he felt like he was paying a fair price. He testified that he looked on the Internet and saw that what he was going to be paying for the gun over two years was about the price of the gun on the Internet, plus "guesstimating" what the interest charge would be. Officer Strick also confirmed that Gordon had made arrangements with Smith & Wesson so they could purchase their own firearms. He testified that "basically we were told to check out the website, see what kind of gun we liked, and let him know and he would get it taken care of as far as the contract and payments for it." (Trial Tr., Vol. I, p. 168.) Strick thought it was a good plan, "[f]or a $1,000 gun you could pay a couple payments every couple of months of $123, so it made it an affordable weapon." (Id. at 172-73.)

---

[7] There had been numerous hearsay objections throughout Gordon's entire testimony; he was having a difficult time relaying events and what occurred without invoking a hearsay objection.

-23-

{¶41} The State claimed that Gordon overcharged the officers $11.56 and $46.72, respectively, for each quarterly lease/purchase payment, for total overcharges of $57.80 and $233.60, for the five payments completed before Gordon was criminally charged. At that point, the Village of Kalida then paid off the remainder of the lease. The State based its claim of wrongdoing on a "Lease Worksheet" ("the Worksheet") included with the lease agreement admitted as State's Exhibit 12. This Worksheet (which was a computer spreadsheet printout) listed the product code and lease prices for each of the six guns and contained some hand-written notes. *According to this Worksheet*, the lease/purchase price for Officer Weaks' gun was $457.07 and Officer Strick's gun was $567.00. Based on these Worksheet prices, plus an 8% interest rate, the State calculated that the officers should have been making quarterly payments of $61.71 and $76.55. Gordon was actually collecting $73.27 and $123.27 from the officers.

{¶42} Gordon testified that he had never seen the Worksheet prior to trial and insisted that the original lease on file in Kalida when he was Chief did not have the Worksheet page attached. There was no evidence presented at trial as to who had created the Worksheet with the individual model prices or whether it had

ever been a part of the lease.[8]   Chief Giblin testified that he contacted Smith & Wesson to obtain a copy of the lease that was used for State's Exhibit 12, so it may be assumed that the Worksheet came from Smith & Wesson's files. However, there was no testimony to authenticate the Worksheet that would prove that it had been a part of the lease agreement sent to Gordon, nor was there any testimony that would disprove Gordon's claims that he had never seen it before. The lease agreement itself did not refer to the Worksheet in any way.

{¶43} Furthermore, the product code for Strick's gun on the Worksheet was different from the product code for Strick's gun in the lease (the Worksheet had a product code of 20747 but Strick's gun's actual product code in the final lease agreement was 204744.)   There was no explanation in the record or at trial concerning the large discrepancy in the price of Strick's gun.  Strick said that his gun, product code model #204744, cost about $1,000 when he looked on the website, but the Worksheet stated that product code #20747 cost only $567.00. The Worksheet definitely contained an error in the gun's product code number, although this matter was never recognized at trial.   There was no evidence concerning whether or not there also might have been an error in the Worksheet's pricing.   Also absent from the record was any explanation or testimony as to who

---

[8] The Worksheet had the following information listed on five separate lines on a column on the left-hand top side of the worksheet:  "6/22/06; Lease Worksheet; Kalida PD, OH; Chief Gordon; Dan Kauhn."  Then it listed the four different model number product codes, the lease price of each model, the quantity, and the total price, which did come to $3,557.27.   Dan Kauhn was listed as the "Rep" on the lease appendix, although he was not the person who signed the lease for S&W.

had made the hand-written notes on the Worksheet, although Gordon denied that it was his handwriting.[9]

{¶44} Finally, we find that the State's computations as to the charges were not correct. The State based its calculations upon a straight 8% interest rate. However, the lease payments were compounded or computed differently, because we calculate that the correct amount of the quarterly payment overcharge, if we use "the Worksheet prices," should have been $10.71 and $45.66, not $11.56 and $46.72 as alleged by the State. We also wonder whether Gordon, Weaks and Strick might have discovered and corrected the errors in the payment prices by the time the lease's final pay-off was made if they would have had the chance. After Gordon was indicted, the Village of Kalida made the final three payments and now has the guns. Gordon, Strick and Weaks, however, have personally paid lease payments to Smith & Wesson of $1,441.80, $616.35, and $366.35 respectively,[10] and they do not have the guns they had intended to purchase.

{¶45} The State did not present any evidence as to the authenticity or accuracy of the Worksheet, nor was there any evidence that Gordon was aware of the prices listed on the Worksheet when he computed the officers' payments. Gordon's testimony that he obtained the prices for the quarterly payments by

---

[9] This Court is not an expert in handwriting analysis, but we do observe that the writing on the Worksheet does look very different from Gordon's handwriting that was on other exhibits.

[10] Gordon did, however, pay Strick and Weeks the $233.60 and $57.80 restitution ordered, so the net amounts they have paid are different.

checking the Smith & Wesson website was confirmed by the officers involved. Based on all of the above we do not find that there was sufficient evidence of Gordon's intent to purposely deprive Officers Weaks and Strick of property in order to sustain a conviction for theft in office for this portion of the offense.

*Third Allegation: Failure to return Village of Kalida*
*police uniforms and equipment*

{¶46} Finally, for the third portion of the Kalida properties and services offense, the State claimed that Gordon's "web of deception" involved depriving Kalida of its property because, after he resigned, Gordon failed to return some of the uniforms and equipment that had been issued to him. The State maintains that the jury did not lose its way when it concluded that "Gordon appropriated the property of the village, with purpose not to give proper consideration for the equipment and uniforms, and did not have a reasonable justification or excuse for not doing so." (Appellee's Br., p. 15.)

{¶47} Gordon testified that he believed he had returned everything that belonged to Kalida. He insisted that some of the equipment that Kalida claimed he improperly retained was his own personal property. He did acknowledge that one or two items belonged to Kalida and should have been returned. However, he testified that he had forgotten he had them and would have gladly given them back if he had been asked or reminded. Gordon argues that this was merely a civil matter that has been criminalized by the State. After a thorough review of the

record, we do not find sufficient evidence to sustain a conviction for Theft in Office under R.C. 2921.41for several reasons.

{¶48} First, the evidence does not clearly specify exactly what property Gordon was alleged to have "stolen." There was no official inventory of goods during the time that Gordon was chief, so Kalida asked Chief Giblin to create an inventory. When Chief Giblin could not locate some items on a partial 2004 inventory he found, he investigated further and looked for receipts for purchases that occurred during the years Gordon was Chief. (See State's Exhibits 6, 7, and 12 – showing receipts from 2002-2006 for 12 alleged purchases of uniform pants and shirts, polo shirts embroidered with "Chief Gordon," leather holsters and duty belts, body armor, and a battery charger.) The State claims that Gordon kept uniforms and equipment totaling more than $1,000, in addition to equipment found at his home. (Sentencing Tr., p. 7.) Only a few of the items on the receipts were found at Gordon's home, namely a polo shirt, some belts/holsters, a battery charger, and the body armor.

{¶49} Although the State had several witnesses testify about the receipts, most of the witnesses did not have first-hand knowledge as to the actual purchases/payments that took place at the time. The new village fiscal officer had only held the office since April 2007 (the previous officer had retired and did not testify). We do not find that the evidence supports the presumption that Gordon

committed a theft of any and all purchased uniforms/belts that were listed on a receipt but were not recovered. The witnesses admitted that there was no way of accounting for clothing that was damaged or that wore out, and there was also testimony that there were other auxiliary and part-time police officers employed during that time who had not returned all of their uniforms. Furthermore, some of the "receipts" seem to be questionable, as one was clearly for an "exchange" and another merely indicated an item was "back-ordered." Some of the later invoices/receipts had verification showing that they were paid for by Kalida, but many of the earlier ones did not. Furthermore, Chief Giblin testified that Gordon did turn in some uniforms to him, and Gordon testified that he had turned in others before Giblin began his employment. The evidence concerning most of these purchases and the disposition of these items was confusing and inconclusive.

{¶50} However, there was sufficient evidence to conclude that Gordon failed to return the three main items that were found in his home and that the State continually referenced throughout the entire trial: the "Bianchi" holsters, the battery charger, and the bullet-proof vest.

{¶51} Concerning these items, we find that there was considerable evidence supporting Gordon's testimony that he paid for the holsters himself, and none to contradict him. First, both Officer Strick and Officer Weaks testified that Kalida only provided uniforms; the village did not provide any holsters/duty belts. A

2002 invoice listing three Bianchi holsters and one black magazine/cuff combo, had a "*" and a written notation by the magazine/cuff combo stating "paid for by village." The amount of that item (plus pro-rated shipping charges) was subtracted from the invoice total showing a hand-written notation for a "balance due of $116.71" for the three other Bianchi holsters. If only the magazine/cuff combo was paid for by Kalida, it would be reasonable to infer that someone else had paid for the other Bianchi holsters, supporting Gordon's claim that he had paid for the holsters himself, but purchased them through the village. This occurred in 2002, and there were no witnesses to verify or contradict Gordon's testimony that he had paid for some of these items and there was no evidence that Kalida had paid for the three other holsters.

{¶52} We also find problems with the "value" that was assigned to the items found at Gordon's home, i.e., $31.30 for the battery charger purchased in 2003, and $750 for the body armor purchased in 2002.[11] R.C. 2913.61(D)(2) explains how to determine the value of business/professional property involved in a theft offense. When the property "retains substantial utility for its purpose," its value is the cost of replacing the property. Id. However, there was no evidence as to what this cost would have been, nor was there any testimony as to whether these

---

[11] Also, the State did not provide a value for the yellow "F. Gordon" name plate, but it did include the original $63.47 price of the polo shirts, purchased in 2005, with "Chief Gordon" personalized embroidery. We question whether these items really retained their value, and what use the village would have for personalized items of apparel.

old items had retained their value and utility, or whether they were outdated and past their useful shelf life.

{¶53} In any case, we find that the State failed to produce evidence that Gordon had the specific intent to deprive the Village of Kalida of its property. See R.C. 2913.02(A)(2)/(3) and 2901.22(A), supra. Under R.C. 2913.01(C), "deprive" means to do any of the following:

> **(1)  Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;**
>
> **(2)  Dispose of property so as to make it unlikely that the owner will recover it;**
>
> **(3)  Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.**

{¶54} There was no evidence that Gordon had done any of the above in order to constitute theft under R.C. 2913.02 when he failed to return some of the property that the village had issued to him.

{¶55} Finally, but also` relevant to our review, was the fact that the State submitted a copy of Kalida's "Handbook Acknowledgement" signed by Gordon and the mayor, as evidence of Gordon's wrong-doing. In this exhibit, Gordon acknowledged receipt of Kalida's policies and rules and signified that he agreed "to conform to the policies of the handbook ***." (State's Ex. 8.) Attached to the

Acknowledgement were relevant portions of the Handbook, including Section 9.4, "Uniform Allowances," which stated:

> **The Village may furnish uniforms to village employees as designated by the Council. These uniforms and all other items issued by the Village remain the property of the village and must be returned when the employee leaves the Village's employment.**

(State's Ex. 8.) The State showed this evidence to no less than *eight* witnesses, and through their repeated testimony, had each witness confirm that this was indeed Kalida's policy, signed by Gordon, and that he was in violation of this policy when he retained village property after the final date of his employment (which was also meticulously established through other documents, exhibits, and testimony). However, the State never read, pointed out, nor mentioned the *final sentence* of the policy, setting forth the consequences of an employee's failure to return all equipment:

> **The employee's final paycheck may be held until all village property has been returned.**

(Id.)

{¶56} We find that the evidence was sufficient to prove that Gordon was liable for violating Kalida's policies and handbook. However, this was a matter of an employment *contract* between an employee and an employer; it was not a criminal matter under the facts and circumstances in this case. At most, it might give rise for a claim of conversion. See, e.g., *Culligan Water Cond. v. Thatcher*,

3d Dist. No. 5-02-36, 2002-Ohio-6189, ¶2 (employer filed a *civil* complaint against a former employee alleging that employee failed to return a water testing kit after leaving his employment.)   The remedy for the "offense" was clearly spelled out in the handbook, i.e., withholding of the final paycheck.   Granted, by the time Kalida discovered that Gordon had not returned all of the village's property, it was too late to withhold his final paycheck.   However, the matter could have been easily remedied by requesting Gordon to pay for the missing items (or return them).   Chief Giblin acknowledged that he had called other former part-time and auxiliary police officers who had not turned in their uniforms but that he had not called Gordon other than for one inquiry, shortly after Gordon left office, regarding some radios.   In fact, Chief Giblin testified that he had been told that *he should call Gordon* if there were any questions/problems regarding missing equipment after Giblin did his inventory.   Chief Giblin did not do so.[12]

{¶57} Under the policy set forth in the handbook, Kalida would issue Gordon uniforms and Gordon was obligated to return the uniforms (and all other items issued by the village) when he resigned or he would be held financially responsible.   Charging Gordon with felony theft in this case is tantamount to imprisonment for a debt he owed to Kalida.   Section 15, Article I of the Ohio Constitution, expressly prohibits imprisonment for a civil debt.   *State v. Myers*, 3d

---

[12] There was testimony from both Giblin and Gordon concerning several incidents that had, at one time at least, caused some animosity between the two.

Dist. No. 6-03-02, 6-03-03, 2003-Ohio-3585, ¶7, citing *Strattman v. Studt* (1969), 20 Ohio St.2d 95, 102, 253 N.E.2d 749. As the Ohio Supreme Court has long held, "money obligations arising upon contract, express or implied, and judgments rendered thereon, are debts within the purview of Section 15 of the (Ohio) Bill of Rights * * *." *Strattman*, 20 Ohio St.2d at 103, quoting *Second National Bank of Sandusky v. Becker* (1900), 62 Ohio St. 289, 56 N.E. 1025, 51 L.R.A. 860, paragraph one of the syllabus. Although *Myers* and *Strattman* concern the payment of court costs, the Ohio Constitution specifically states that "[n]o person shall be imprisoned for debt in *any* civil action, on mesne or final process, unless in cases of fraud." (Emphasis added.) Const. Art. 1, §15.

{¶58} We are not suggesting that a theft offense can never occur when a party wrongfully retains property that was originally obtained according to a contractual agreement. Cases of fraud are definitely excluded from the prohibition against imprisonment. See Const. Art. 1, §15. There are many circumstances when a party may be charged with a theft offense after wrongfully keeping or disposing of property that was originally obtained as a result of a rental or other type of contractual agreement. See, e.g., *State v. Riley*, 9th Dist. No. 24789, 2010-Ohio-1350 (finding defendant guilty of theft when he failed to return or pay for forklift after numerous calls and attempts to have the property returned); *State v. Martindale*, 5th Dist. No. 00CA30, 2001 WL 361175 (finding no error in the trial

court's considering appellant's failure to return the property, *after notice to do so*, as evidence of intent to commit a theft); R.C. 2913.72 (listing examples of what may be considered evidence of intent to commit theft of rental property or services.)    However, in this case, there were no allegations or evidence that Gordon's intentions were fraudulent.  Nor was this a case where he had sold, secreted, or disposed of the property, or that he refused to pay for or return the specific property after being asked.

{¶59} In several opinions written when he was a judge for the Hamilton County Municipal court, Judge Painter observed that too often civil wrongs are inappropriately placed into the context of criminal wrongdoing.  In one case where the defendant was accused of theft for failing to make timely payments or return some furniture, the trial court wrote:

> **From a public policy standpoint, allowing a criminal conviction in this type of case would, simply stated, be ridiculous. The prosecuting witnesses and their employer \*\*\*, have myriad rights and remedies in a court exercising civil jurisdiction.**

*State v. Glenn* (1990), 56 Ohio Misc.2d 1, 3, 564 N.E.2d 1149.   Noting a disturbing tendency to bring criminal charges in cases more properly decided in a civil court, Judge Painter stated that "[g]reat care should be taken that the criminal

law not be employed to attempt to right an alleged civil wrong. Criminals enough we have." *State v. Howell* (1994), 64 Ohio Misc.2d. 23, 29, 639 N.E.2d 531.[13]

{¶60} For all of the reasons stated above, we find that there was insufficient evidence of Gordon's criminal intent to sustain a conviction for Theft in Office for Gordon's failure to return alleged village property after he left office. The Village of Kalida had ample civil remedies to redress any wrongs Gordon committed by failing to follow the employment handbook procedures.

{¶61} The Dissent is correct in pointing out that an issue that involves a civil wrong (i.e., a matter of contract in this case), may still be prosecuted by the State as a criminal matter, where warranted. However, "courts must apply a rule of reason in their interpretation of this state's criminal statutes." *State v. Parks* (1984) 13 Ohio App.3d 85, 86, 468 N.E.2d 104 (stating that a finding that the defendant was a "public official" performing "official functions" for the purposes of R.C. 2921.13 "would be to stretch the reach of that statute beyond logic and reason"). A court has the duty to construe statutes to avoid absurd results. *State v. Blagajevic* (1985), 21 Ohio App.3d 297, 299, 488 N.E.2d 495, citing *Canton v. Imperial Bowling Lanes* (1968), 16 Ohio St.2d 47, 242 N.E.2d 566, paragraph four

---

[13] We agree with the Dissent's assertion that *Glenn* and *Howell* are somewhat distinguishable – we were unable to locate any cases where an employee was convicted of a felony and sentenced to prison for failing to return his or her uniforms/equipment. However, contrary to the Dissent's statement, these cases were not relied upon for precedential purposes, but were merely utilized as examples of the inappropriateness of bringing criminal charges in the context of a civil wrongdoing.

of the syllabus. In *Blagajevic*, the court was considering the extent of the meaning of a "public official" under R.C. 2921.41 and found that "[t]o read the theft-in-office statute as broadly as applied in this case, i.e., to apply to a janitor who has committed a petty theft, would virtually subject all public employees who have taken a pencil or rubber band home to prosecution for a third degree felony." Id. We believe the same reasoning can be applied in this case. Although Gordon was clearly a public official, and he did not comply with the terms applicable to all employees in the handbook, he was not improperly "using" his official position when he failed to return a personalized polo shirt.

{¶62} Although the Dissent asserts that the evidence could also be construed to "infer" that "a theft offense occurred," we must remain mindful of the fact that Gordon was not indicted for a theft offense under R.C. Chapter 2913; Gordon was indicted for *theft in office* under R.C. Chapter 2921. "[W]hile thievery is regulated by both chapters, R.C. chapter 2921 adds [additional] requirements in order to serve a separate purpose – more stringent punishment of, and protection of the public from, those who abuse and corrupt public offices." *State v. Krutz* (1986), 28 Ohio St.3d 36, 38-39, 502 N.E.2d 210. R.C. Chapter 2921, titled "Offenses Against Justice and Public Administration," addresses crimes of public officials "which tend to subvert the processes of democratic government." Id. This Chapter includes crimes of "bribery, perjury, and related

offenses, crimes which hamper law enforcement and the administration of justice * * *." *State v. Knight* (1998), 131 Ohio App.3d 349, 354, 722 N.E.2d 568. We maintain that the issues concerning Gordon's failure to return all of the uniforms/equipment issued to him was a matter of contract and that there was insufficient evidence to prove beyond a reasonable doubt that Gordon "used" his office in the manner intended by R.C. 2921.41(A)(1) to commit a "crime" under this chapter of the revised code.

{¶63} After a thorough review of the record, we find that there was insufficient evidence to prove beyond a reasonable doubt that Gordon was guilty of Theft in Office for the various allegations pertinent to the Kalida property and services case. Gordon's first assignment of error is sustained relative to the Kalida property and services case no. 9-CR-40, appellate case no. 12-10-05.

*Third Assignment of Error*

{¶64} In his final assignment of error, Gordon contends that the trial court abused its discretion by sentencing him to more than minimum prison terms for a first offense. Based upon our disposition of the previous assignments of error, this issue is now moot. However, we note that at the sentencing hearing the State informed the trial court that "the State would acknowledge that the defendant is eligible for judicial release" and that it would be "inclined to look favorably toward a motion for judicial release" if restitution was paid. (Sentencing Tr., p.

12.)  If this statement was indicative of the State's or the trial court's intentions at the time of sentencing, we must remind them that a defendant who is found guilty of theft in office is not eligible for judicial release pursuant to R.C. 2929.20(A)(1)(b)(i).

{¶65} Finding merit in the issues raised by the appellant, the judgments of the Putnam County Court of Common Pleas are reversed and the causes are remanded for further consideration consistent with this opinion.

*Judgments Reversed and
Causes Remanded*

**ROGERS, P.J., concurs in Judgment Only.**

**SHAW, J., DISSENTS.**

{¶66} Although not essential to any of the convictions, I agree with the majority that the evidence pertaining to the use of the internet in this case is not sufficient to support a charge of theft in office.  I also agree with the majority that the monetary valuations assigned to the vests and other uniform paraphernalia could have been made clearer, although I do not agree that the evidence is fatally insufficient on this point.  However, even if it is determined to be so, the effect is only to reduce the conviction on that count from a felony of the fourth degree to a felony of the fifth degree and *not* to vacate the entire verdict as the majority has done.

{¶67} As to every remaining aspect of this case, I respectfully dissent from the majority opinion to reverse Gordon's convictions for theft in office. Specifically, I find that the majority's conclusions are, in many instances, based upon interpretations and speculation weighted heavily in favor of the defendant's version of events, the credibility of which has been determined adversely by the jury. In my view, this approach has led the majority to the application of improper standards of appellate review in some instances and more importantly in other instances, to an incomplete and flawed analysis of significant portions of the record.

{¶68} As a result, I believe it is necessary to thoroughly revisit the evidence and testimony in this case as part of my dissent. For ease of discussion and for the sake of clarity, I will review each count/case separately, as did the majority.

### Case No. 9-CR-19 – The Ottawa Firearms Case

{¶69} In his first assignment of error, Gordon asserts that his conviction of theft in office in Case No. 9-CR-19 was against the manifest weight of the evidence. He further contends in his second assignment of error that the evidence was not sufficient to establish that he used his office as Chief of Police of the Village of Kalida in aid of committing a theft offense or permitted or assented to its use in aid of committing a theft offense in accordance with R.C. 2921.41(A)(1).

The majority agrees with Gordon that the evidence was not sufficient to establish the use of Gordon's office to aid in committing the theft offense involving the Ottawa firearms case and reverses this conviction. Having reached this conclusion, the majority also determines that Gordon's first assignment of error in this regard is moot. I disagree with the majority's conclusion that the State failed to present sufficient evidence to demonstrate a palpable nexus between Gordon's wrongdoing and his public office.

{¶70} In reaching its conclusion, the majority relies on *State v. Bowsher*, supra, wherein the Sixth District Court of Appeals held that R.C. 2921.41(A) requires some "palpable nexus between the auspices of the office and the wrongdoing" before a defendant can be convicted of theft in office. The Sixth District concluded that the evidence in *Bowsher* failed to establish such a nexus. However, the facts of *Bowsher* are readily distinguishable from the case sub judice.

{¶71} Bowsher was a Toledo police officer who was also the volunteer treasurer of a police-firefighters charitable organization that collected money for events, including a golf tournament. Although Bowsher collected these monies while wearing his uniform, the city did not sanction the golf tournament and the funds collected did not belong to the public. While treasurer, Bowsher took $211.00 from the charitable organization and was subsequently indicted for theft

in office. *Bowsher*, supra. The Sixth District concluded that Bowsher's indictment concerned "itself only with * * * -in effect, an embezzlement of nonpublic monies. The fact that [Bowsher] had solicited contributions while in uniform, on duty, and in a city police car ha[d] little, if any, relationship to a later improper withdrawal of funds from a private account." *Bowsher*, 116 Ohio App.3d at 175.

{¶72} In this case, Knowlton testified that he came to know Gordon through monthly meetings of the chiefs of police in Putnam County while Gordon was the Kalida Police Chief. (Trial Trans., Vol. II, p. 300.) Knowlton testified that the sale of the Ottawa firearms was first discussed at a chiefs' meeting when concerns were raised regarding the MAN unit, a division of the Putnam County Sheriff's Office that investigates drug crimes. (id.) The various chiefs were concerned over whether the other law enforcement agencies in the county, such as the Ottawa Police Department, were going to have to begin investigating drug crimes. (id.) Knowlton began questioning how his agency was going to finance such an endeavor, and Gordon informed him that he could sell old guns in order to raise money. (id.) Gordon also told Knowlton that he was a gun dealer, that he used to own a gun shop, and that he sold firearms for other police departments "all the time." (id. at 301.)

{¶73} Knowlton testified that he thought that this was a good idea and so he had Gordon come to the Ottawa Police Department ("O.P.D.") and permitted him to take a number of guns with him to determine their value.[14] He further testified that he asked Gordon while they were in the O.P.D. property room if what they were doing was legal. Gordon told him that it was legal and once again told Knowlton that he did it all the time for other departments. (id. at 303.)

{¶74} The Kistlers, who owned Triple J Firearms, testified that Gordon, who they knew was the Kalida Police Chief, came to their shop on January 13, 2006, with a number of guns belonging to O.P.D. Richard Kistler specifically recalled that Gordon wanted to be paid in cash. (id. at 154.) Although Triple J usually purchased guns with a check to "keep track of it better," Richard said that cash would be "fine" because "being a police officer you wouldn't think any different." (id.) The Kistlers also paid Gordon in cash when he returned on January 25, 2006, with a number of long guns (shotguns and rifles), eight of which he informed the Kistlers belonged to O.P.D., and did not issue a receipt for this transaction upon Gordon's request not to do so. (id. at 197.)

---

[14] The majority notes that Ottawa and Knowlton must not have thought that Gordon acted criminally in selling these weapons, although Knowlton testified that he only gave Gordon permission to clean up and obtain an estimate on them, because Knowlton endorsed hiring him as Ottawa's police chief and, in fact, Ottawa hired him as its police chief several months after he sold the weapons, which Knowlton and the municipal director both knew Gordon had done. Although the parties dispute whether Knowlton gave these weapons to Gordon simply to obtain an estimate as to their value or whether he gave Gordon permission to sell these weapons, this issue is not dispositive of the issue presently being addressed because this charge of theft primarily concerned the retention of some of the proceeds received by Gordon for the sale of these weapons regardless of whether he had permission to sell them. Furthermore, Gordon's retention of some of the proceeds was not discovered until after he became the O.P.D. chief.

{¶75} During cross-examination, Richard reiterated that he knew Gordon was the Kalida Police Chief but that Gordon was selling him guns that belonged to O.P.D. (id. at 172.) He was then asked if he ever questioned why Gordon would be "selling stuff from Ottawa," and he replied that Gordon told him that O.P.D. "wanted to get rid of the guns," that he was "kind of like there [*sic*] mediator for getting rid of them[,]" and that this did not raise suspicions with him because "[i]f you can't trust a cop, who can you trust." (id.)

{¶76} This testimony clearly establishes a palpable nexus between Gordon's wrongdoing and the public office he held. First, Gordon's position as police chief is the only reason he was in a position to be in attendance at the chiefs' meeting where he first suggested to Knowlton that O.P.D. could sell its firearms. Second, he told Knowlton that he sold weapons for other departments all the time and that this activity was legal. Gordon being a fellow officer and someone who appeared to know a great deal about guns led Knowlton to believe Gordon.

{¶77} Third, although the majority concludes that Gordon did not have to be a police officer to obtain the firearms from his friend, Knowlton, the testimony does not indicate in any way that Knowlton allowed Gordon to enter the O.P.D. property room and subsequently leave the Ottawa police station with a number of firearms merely because of their friendship. We find it highly improbable, even

given the number of unwise decisions Knowlton made, that he would have allowed a non-law enforcement person to simply walk away with a large number of firearms because he was Knowlton's friend.  Rather, the evidence showed that Knowlton allowed a fellow officer, who appeared to know what he was doing and who represented that he often did this sort of thing for other departments, to leave with these firearms.

{¶78} Fourth, although a person does not have to be a police officer to sell a firearm, Gordon's position as a police officer created a sense of trust in the Kistlers that led them not to question that he was permitted to sell firearms belonging to O.P.D. and to pay him in cash without a completed receipt, which made tracing how much he received more difficult.  Thus, his position as a police officer aided him in selling these weapons.  Fifth, although Gordon was not indicted under Division (A)(2), which involves government owned property, the money he was alleged to have taken was unquestionably government property, not privately held funds, and his position as a public official aided him in acquiring these public funds.

{¶79} Moreover, the requirement of *Bowsher* is that a palpable nexus must exist because the language of R.C. 2921.41(A)(1) requires that the offender use his office to aid in the commission of the theft offense.  There is no requirement that the office be the *sole or primary means* of committing the offense but that it *aid* in

the commission of the offense. Under these facts, Gordon's office certainly aided him in the commission of the theft of the proceeds from the sale of the Ottawa firearms.

{¶80} For all of these reasons, it is clear that, when construing the facts in a light most favorable to the prosecution, the evidence was sufficient to establish a palpable nexus between Gordon's position as a police officer and his wrongdoing that would warrant a finding that he used his office to aid him in committing a theft offense. Therefore, I would also proceed to address Gordon's first assignment of error regarding whether his conviction was against the manifest weight of the evidence. In so doing, it cannot be said in this case that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶81} More specifically, the Kistlers testified that they had three transactions involving firearms belonging to O.P.D. and handled by Gordon. They also had documentation to this effect, including their firearms record book, which is a book that the federal Bureau of Alcohol, Tobacco, and Firearms requires firearms dealers to maintain. The first transaction on January 13, 2006, involved thirteen handguns, which Gordon represented belonged to O.P.D. Richard Kistler testified that he spoke with Gordon about buying some old evidence guns, that

Gordon came in the first time with the handguns, Richard looked at each one, and that they agreed on a price of approximately $1,000.00.

{¶82} Richard's wife, Jackie, who handled the paperwork for the business, testified that she wrote a receipt for all of the handguns on a triplicate form but did not write in a total dollar amount because Gordon told her that it was not necessary. She gave the top copy of this triplicate receipt, which was white, to Gordon, and retained the yellow and pink copies. The yellow and pink copies were admitted into evidence and showed no dollar amounts, including a total. She further testified that Gordon insisted on cash but that they did not have a large amount of cash at their disposal so they called upon a friend/business associate, Larry Smith, who loaned them $950.00 for this transaction. Jackie wrote this amount on a separate sheet of paper and kept a tally of the sales of these weapons and the payments they made to Smith to repay this interest-free loan. Jackie specifically testified that they gave Gordon $950.00 for these weapons, which is why they would have borrowed that amount from Smith. Records from O.P.D. indicated that twelve of these guns came from O.P.D.'s evidence/property room or its separate weapons storage locker. The thirteenth gun, a Ruger, was the private property of Knowlton's wife, which Knowlton had also requested that Gordon sell.

{¶83} The next transaction involving Gordon and O.P.D. at Triple J occurred on January 23, 2006. This transaction was merely a transfer of ownership of an H & R Topper 20 gauge shotgun, serial # BA600063, from O.P.D. to Bradley Niemeyer and did not involve a sale of this weapon to Triple J.[15] Rather, the two men conducted a private transfer and utilized Triple J's firearms records book to register the transfer of ownership to Niemeyer. Niemeyer, a friend of Gordon's, testified that he purchased this shotgun from Gordon for approximately $50.00-$75.00 in cash and that the two men went to Triple J to complete the necessary paperwork. Records from O.P.D. indicated that this gun came from O.P.D.'s evidence/property room.

{¶84} The last transaction involving Triple J occurred on January 25, 2006. Richard Kistler testified that this time Gordon brought a number of long guns to sell. His records showed that Triple J purchased a total of twelve long guns: two belonging to the Lucky Police Department, two belonging to Gordon, and eight belonging to O.P.D. He further testified that the information on the ownership of these guns, like that of the handguns, came from Gordon. These were also recorded in the firearms record book of Triple J. Once again, Gordon wanted to be paid in cash, so Triple J borrowed the money from Smith. Richard also

---

[15] Additional testimony indicated that Triple J and Ottawa Ordnance, the other firearms dealership involved in this case, bought and sold guns, and that these transfers of ownership were recorded in their firearms records book. These dealers also assisted private-party firearms transfers by allowing the parties to record a transfer of ownership of a firearm in the business' firearms records books so that the firearm would be properly registered to the new owner.

identified the separate sheet of paper that Jackie used to record the amount of money borrowed from Smith and paid to Gordon for this transaction.[16] This amount totaled $1,150.00, but the sheet did not list the individual prices of each gun. Although there was no receipt because Gordon told them that he did not want one, Richard testified that he has a good memory when it involves firearms acquisitions and that he was able to place a value on each gun when Special Agent Justice asked him to do so two years after this transaction. The amounts he placed on the O.P.D. guns sold that day totaled $485.00. Jackie also testified regarding this transaction and identified the separate sheet of paper that she used to document the amount of money borrowed from Smith, which was $1,150.00. Jackie also testified that this amount is what Triple J paid directly to Gordon for all twelve long guns. This paper also documented the sales of some of the weapons that Triple J purchased from Gordon and the amounts paid back to Smith.

{¶85} In addition to the Triple J transactions, the State presented the testimony of Cindy Verhoff, who was the co-owner of Ottawa Ordnance. Verhoff testified that her firearms record book showed that on January 5, 2006, a Smith and Wesson 5906, 9 mm pistol, serial # TVL2979, was transferred from O.P.D. to Gerald Gordon and this transaction was registered at Ottawa Ordnance. A copy of this page of the firearms record book was also admitted into evidence without

---

[16] This transaction was recorded on the other side of the sheet of paper used to document the amount of money borrowed from Smith for the first transaction with Gordon involving the O.P.D. handguns.

objection. Gerald Gordon, Forest Gordon's brother, testified that he purchased this gun from his brother in January of 2006, for approximately $200.00-$250.00 in cash and that they went to Ottawa Ordnance so that he could fill out the required background check and have the gun registered in his name. Inventory records from O.P.D. indicated that this gun was O.P.D. property.

{¶86} Knowlton testified that the only money he or Ottawa ever received from Gordon for the weapons from O.P.D. occurred at his home one weekend in early 2006. Knowlton testified that on that day Gordon stopped at his home and gave him $900.00 cash and a white receipt from Triple J that showed a total amount of $900.00. He further testified that he took this money and receipt to his office and locked both in his desk, where they remained for nearly two years because Knowlton forgot about the money. When asked about whether he discussed the value of these weapons with Gordon before Gordon sold them, Knowlton testified that he did not but that he was surprised when Gordon gave him $900.00 because he thought the amount was fairly high. Knowlton also testified that the only other money he ever received from Gordon was on a different day when Gordon gave him $100.00-$150.00 for the sale of his wife's Ruger handgun. Knowlton stated that in November of 2007, the Ottawa Municipal Director, Jack Williams, received a phone call from the Putnam County Sheriff's Office about these weapons being sold and that Williams came to him

about the money Gordon had given him and told him to deposit it with the Ottawa clerk. That is when Knowlton first thought about the money again, and he retrieved it and the receipt from his desk and deposited the $900.00 with the clerk.

{¶87} Knowlton further testified that Williams was contacted by the sheriff's office regarding a number of other guns belonging to O.P.D. for which Ottawa never received any proceeds. Knowlton then questioned Gordon about these long guns, and Gordon told him that those weapons were a separate batch that he took in that belonged to Gordon and a friend of his and that he did not know why they would have listed them as belonging to O.P.D.

{¶88} Jack Williams testified that Knowlton told him that he gave Gordon a number of O.P.D. firearms to clean up and to obtain an estimate of their value. Williams stated at that time he told Knowlton to get the weapons back from Gordon because this was not proper procedure. According to Williams, shortly after this conversation, Knowlton informed him that Gordon had sold the weapons for $900.00. Williams saw the white receipt for $900.00 and the cash but did not actually count the money at that time. Williams testified that he told Knowlton to deposit the money with the Ottawa clerk.[17] Approximately twenty-two months later, he was contacted by the Putnam County Sheriff's Office about the sale of

---

[17] Williams and Knowlton gave differing accounts regarding Williams' reaction to the fact that Knowlton gave Gordon a number of O.P.D. weapons and as to what Williams instructed Knowlton to do with the $900.00 that Knowlton received from Gordon. However, both testified about the white receipt having a total of $900.00 written on it, that there was cash with the receipt, and that when Knowlton eventually took the money to the Ottawa clerk, it, in fact, totaled $900.00.

these weapons. When he could not locate any receipt for the money at the clerk's office, Williams went to Knowlton and found that Knowlton had the money and the white receipt in a bank bag in the bottom drawer of his desk. Williams then accompanied Knowlton to the clerk's office and verified that the cash totaled $900.00. The State also admitted a receipt from the clerk's office showing that $900.00 was deposited by O.P.D. for the sale of guns.

{¶89} The white receipt from Triple J for the January 13th handguns transaction was also admitted into evidence. This receipt, which testimony revealed was the top copy of the triplicate form that was given to Gordon, had a total of $900.00 written on it. Both Richard and Jackie Kistler testified that this was not their handwriting and that neither had written that on the white receipt. Special Agent Justice testified that the white receipt was sent to BCI for a handwriting analysis but that the analyst determined that there was not enough on the receipt to conduct a comparison.

{¶90} Special Agent Justice testified he spoke with Gordon about these transactions and that Gordon admitted to selling all of the handguns listed in the Triple J firearms record book as belonging to O.P.D. on January 13, 2006, but that the last one on the list, the Ruger, actually belonged to Knowlton and he sold it for him. However, Gordon also told him that only three of the long guns, two Smith and Wesson 3000 12 gauge shotguns and the H & R Topper, listed on the record

book on January 23 and 25, 2006, were O.P.D.'s and that the other long guns were his personal weapons. Gordon told Special Agent Justice that he did not know how or why Triple J would have documented that the other long guns belonged to O.P.D.

{¶91} At the time that Special Agent Justice spoke with Gordon, he had copies of Triple J's firearms record book but had not examined the property records of O.P.D. and had not discovered the transfer of the Smith and Wesson 5906 that occurred through Ottawa Ordnance.[18] When Special Agent Justice later examined the property records of O.P.D. and compared them to the firearms record books of Triple J and Ottawa Ordnance, he was able to trace a number of the guns sold to and/or transferred through Triple J and Ottawa Ordnance to O.P.D., including four of the long guns that Gordon told him belonged to him rather than O.P.D. and the handgun transferred through Ottawa Ordnance that Gordon failed to mention selling to his brother.

{¶92} Gordon also testified regarding the sales of these guns. He testified that he sold a number of handguns and long guns for O.P.D. to Triple J and that he received a total amount of $900.00 for all of these guns. In explaining the Triple J transactions, Gordon stated that he first brought in the handguns and during the

---

[18] Special Agent Justice testified that he could not account for the whereabouts of the Smith and Wesson 5906, Serial # TVL2979. However, he discovered that this was the type of weapon that O.P.D. previously used as a duty weapon but had traded at Ottawa Ordnance for another type. Believing that perhaps this gun had been overlooked during the trading of duty weapons, he contacted Ottawa Ordnance. As a result, he discovered that Gordon had transferred this weapon to his brother.

negotiations with Richard Kistler offered to "throw in" several long guns belonging to O.P.D. in exchange for $900.00. He testified that he did not have the long guns with him but that they agreed on the price, and he brought the O.P.D. long guns with him on January 25, 2006. He testified that the long guns documented in the firearms record book for the 25th that were listed as belonging to O.P.D. were the ones he offered to throw in with the handguns for $900.00 and that he did not receive any additional money for those guns. Gordon also acknowledged selling the Smith and Wesson 5906 to his brother for $175.00-$200.00 and to selling the H & R Topper to Brad Niemeyer for $50.00-$75.00. Gordon further testified that he gave Knowlton the $900.00 he received from Triple J for the O.P.D. weapons, the $150.00 he received for the Ruger belonging to Knowlton's wife, and the monies he received for the guns sold to his brother and Niemeyer. Regarding the total amount written on the white receipt from Triple J, Gordon testified that he started to leave and noticed that there was no total on his receipt so he had Jackie Kistler fill in the amount but that she did not do so on the yellow and pink copies, which is why there was no amount written on these forms.

{¶93} In comparing this evidence, we find that there is no dispute that Gordon gave Knowlton at least $900.00 for the sale of O.P.D. firearms. However, Gordon's testimony was that he additionally gave Knowlton approximately

$225.00 (when valuing the sales at the lowest amounts testified to by Gordon)-$275.00 (when valuing the sales at the highest amounts testified to by Gordon) for the O.P.D. gun sold to his brother and the O.P.D. gun sold to Niemeyer, but Knowlton testified that he did not receive any additional money from the sale of O.P.D. weapons. In addition to this discrepancy, Jackie Kistler was adamant that Triple J gave Gordon $950.00 (not $900.00) for the handguns and an additional $1,150.00 for the long guns. Richard Kistler also testified that some of the $1,150.00, totaling approximately $485.00, was given to Gordon in exchange for eight long guns that Gordon represented as belonging to O.P.D.[19]

{¶94} Jackie also specifically testified that she did not write a total on the triplicate receipt for the first transaction and that the total listed solely on the white copy was not written by her. Her husband, Richard, also testified that neither he nor his wife wrote a total on the white copy and that Gordon told them not to do so because he would do it later. Although he found that to be strange, Richard testified that they knew him well enough so they let it go. In addition, Richard testified that he and Gordon looked at each gun on the 13th, he placed a value on each, and that they agreed on a final total, which was reflected in an amount of $950.00 on the separate sheet of paper that his wife used to keep track of their loan payments to Smith.

---

[19] Two of these eight guns, a Mossberg 500, 12 gauge shotgun, and a High Point 995, 9mm rifle (each of which were valued at $50.00 by Richard Kistler), were not found in any of the records of O.P.D.

{¶95} As to the January 25th transaction involving the long guns, Richard testified that Gordon called him and told him he had a number of long guns from a couple of police departments and some that were personally owned and wanted to know if Richard would be interested in purchasing them. Richard told him to bring them in so that he could take a look at them and that they could "go from there." (Trial Trans., 1/20/10, Vol. II, p. 163.) Gordon brought the guns to Triple J and indicated that eight of these guns belonged to O.P.D. They agreed on a price, the Kistlers borrowed the money from Smith, and Gordon left with this amount in cash. Although Richard was unable to recall exactly how much he paid for each gun, he testified that the amounts he gave to Special Agent Justice two years after the transaction were "pretty accurate" reflections of the value he placed on the guns at the time he bought them from Gordon. (id. at p. 166.) These amounts totaled $485.00 for weapons that were identified as O.P.D. weapons in the firearms record book. During cross-examination, Richard testified that he did not agree to a price for these guns while on the phone with Gordon because it was not good practice to offer a price without looking at the guns.

{¶96} Nothing in Richard's or Jackie's testimony indicated that the long guns brought into Triple J on the 25th were part of the sales transaction on the 13th, but it established that they paid him additional money for the long guns belonging to O.P.D. Moreover, Richard's testimony about examining each gun and his

unwillingness to give a price for a gun over the phone when he had not seen the gun supports the conclusion that he would not have negotiated a purchase price on the 13th, which, according to Gordon, included guns he had never examined. Further, Gordon did not tell Knowlton or Special Agent Justice that the long guns were part of the transaction on the 13th and that he simply brought them in twelve days later. Rather, he stated that all the long guns belonged to him, not O.P.D., and he had no idea why Triple J's records indicated that some of them belonged to O.P.D. It was not until he testified at trial that this version of events regarding the long guns came to light. In addition, the transaction with his brother for the Smith and Wesson 5906 was only discovered when Special Agent Justice examined O.P.D.'s records. Gordon did not tell him about it. All of this renders Gordon's entire testimony suspect.

{¶97} While Knowlton, to whom Gordon claims he gave additional monies, arguably may have had a reason to testify falsely if he was the one responsible for the missing money, there is a reasonable inference from all of the evidence before the jury that Knowlton did not take this money. Indeed, twenty-two months after receiving the $900.00, Knowlton still had this money and the receipt in his desk drawer. Thus, a reasonable jury could have concluded that if Gordon gave him additional money, Knowlton would have also placed that money in his desk drawer with the other money. Further, there is nothing in the record to

indicate that any of the other witnesses had a motivation to lie, particularly the Kistlers, who no longer operate a gun dealership and stood nothing to gain from their testimony. In any event, the jury was in a far better position than this Court to determine the credibility of each witness through observing their demeanor, candor, voice inflection, etc. while each testified.

{¶98} In reviewing the entire record, weighing the evidence and all of the reasonable inferences, and considering the credibility of the witnesses, there is no basis in this case for an appellate court to conclude that in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. To the contrary, the only evidence that tended to show that Gordon did not take some of the money that he was paid through the sales of O.P.D. weapons came from Gordon's own self-serving testimony. Thus, the first and second assignments of error, as they pertain to this offense, should be overruled and Gordon's conviction for this offense should be affirmed.

### Case No. 9-CR-40 – The Kalida Property and Services Case

{¶99} As previously noted, in his first assignment of error, Gordon also contends that the verdict of guilty on his second case of theft in office, which involved the Village of Kalida's property and services, was against the manifest weight of the evidence. Despite this fact, the majority concluded that what his

arguments actually raised in this case was a legal question as to the sufficiency of the evidence. While the majority correctly notes that Gordon's brief to this Court makes a number of statements that the State "failed to produce any evidence," that "the record is completely lacking in any evidence," and "there is no evidence," these statements are often made in connection with Gordon's version of events and the lack of direct evidence to negate Gordon's testimony as to his thought process during the relevant time frame. Thus, in many instances, Gordon employs this language in an attempt to support his position that the jury clearly lost its way (a manifest weight standard), not as a challenge to the legal sufficiency of the evidence. Therefore, I disagree with the majority's opinion that Gordon's *entire* argument as to this count challenges only the sufficiency of the evidence, particularly as it relates to the evidence of Gordon's intent to deprive.

{¶100} However, Gordon also argues that the State failed to present any evidence that he deprived the Village of Kalida of services on the portion of this charge involving his internet usage and further argues that the remaining allegations regarding the Smith and Wesson lease and the Village of Kalida property are contract disputes rather than criminal matters. The majority evaluated these arguments under the standards for determining the sufficiency of the evidence, and I agree that these two arguments do raise issues of legal sufficiency. Given these arguments, the majority's decision to review the entire case involving

the property and services of the Village of Kalida under the sufficiency standards, and for the simple sake of clarity, I will address all of the issues raised in this case under the standards used in reviewing challenges to the sufficiency of the evidence.

{¶101} As the majority correctly notes, "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Jenks*, 61 Ohio St.3d at paragraph two of the syllabus. Most importantly, "[t]he relevant inquiry is whether, *after viewing the evidence in a light most favorable to the prosecution*, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Emphasis added.) *Id.*, citing *Jackson v. Virginia* (1979), 443 U.S. 307. Furthermore,

> **[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged,** ***there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.***

(Emphasis added.) *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. "'A reversal based on the insufficiency of the evidence * * * means that no rational

factfinder could have voted to convict the defendant.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Tibbs v. Florida* (1982), 457 U.S. 31, 41.

{¶102} As to the allegations involving the theft of services from Kalida for the time Gordon spent on the computer engaging in inappropriate conversations of a sexual nature, I concur with the majority in its conclusion that there was no evidence, either direct or circumstantial, to demonstrate that Gordon deprived the Village of Kalida of any services as there was nothing to show that due to his improper online activities, Gordon neglected his job duties in any way or poorly performed them. See *Wolf*, 2009-Ohio-2018.

{¶103} As to the allegations involving the theft of Kalida property, i.e the uniforms and equipment, I concur with the majority's conclusion that the evidence was not sufficient "that Gordon committed a theft of any and all purchased uniforms/belts that were listed on a receipt but not recovered." (Maj. Opin. at ¶ 49.) I also concur with the majority's conclusion that "there was sufficient evidence to conclude that Gordon failed to return the three main items that were found in his home * * *: the 'Bianchi' holsters, the battery charger, and the bullet-proof vest." (id. at ¶ 50.) However, I dissent from the majority's conclusion that there was not sufficient evidence of Gordon's intent to deprive Kalida of this

property.[20]

{¶104} The majority correctly notes that "deprive" means to do any of the following: "(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration. * * * " R.C. 2913.01(C)(1). The majority then concludes that there was no evidence to show that Gordon deprived Kalida of its property "when he failed to return some of the property that the village had issued to him." (id. at ¶ 54.) In so doing, the majority relies entirely upon Gordon's testimony that he believed that he had returned everything to Kalida that belonged to it, that he had forgotten that he had the items that were found in his home during the execution of the search warrant, and that he would have given these items back if he had been asked or reminded.

{¶105} However, the standard of review in evaluating whether there is sufficient evidence to sustain a conviction, as previously noted, requires this Court to construe the evidence in a light most favorable to the State. When applying that standard, the State satisfied its burden particularly in respect to the polo shirt, body

---

[20] Although the majority raises concerns with the amounts attributed to these items and whether the State presented sufficient evidence of the value of these items, this issue was not raised in Gordon's appeal to this Court, constituting a waiver of this issue. Further, even under a plain error analysis, there was evidence as to the purchase price of these items and nothing to infer that they did not retain even a modicum of value. Thus, while a value in excess of $500.00 *may* not have been warranted, this would simply reduce this to a felony of the fifth degree rather than a fourth degree, see R.C. 2921.41(B), and would not warrant a complete reversal of his conviction for theft in office.

armor, holster, and battery charger that were found in Gordon's home, some five months after his employment with the Village of Kalida ended.

{¶106} The evidence presented by the State shows that (1) these items were identified as belonging to Kalida, some of which Gordon also acknowledged belonged to Kalida, that (2) the employee handbook, signed by Gordon, states that all uniforms and other items issued by the Village of Kalida remained the property of Kalida and were to be returned upon the termination of employment, and that (3) Gordon never returned these items to the Village of Kalida until they were seized during the execution of a search warrant a number of months later. All of this evidence could lead a rational trier of fact to infer that Gordon intended to deprive Kalida of its property. Thus, a reasonable factfinder could find this essential element of the offense of theft proven beyond a reasonable doubt despite whether there was any reasonable theory of innocence, as this circumstantial evidence of guilt did not have to be irreconcilable with Gordon's version of events. See *Jenks*, supra.

{¶107} This issue is repeatedly mischaracterized by the majority as one of an evaluation of Gordon's credibility by the appellate court. However, this is a question of whether the evidence is sufficient to submit to the jury; it is not a question of whether we believe Gordon's version of events or the State's. We are charged with construing the evidence in a light most favorable to the State. Once

the State presents sufficient evidence, through direct and/or circumstantial evidence, the question of credibility belongs, rightly so, to the factfinder, who is in a far better position than this Court to determine the credibility of each witness through observing their demeanor, candor, voice inflection, etc. while each testified, and who, in this case, chose to find Gordon's testimony to not be credible.

{¶108} Moreover, I disagree with the majority's conclusion that this was a matter of an employment contract and not a criminal matter under the facts and circumstances of this case. In support of its position, the majority relies upon two cases from the Hamilton County Municipal Court: *Glenn*, supra, and *Howell*, supra. However, these cases are distinguishable from the case sub judice.

{¶109} In *Glenn*, the defendant was charged with the offense of theft for failing to make timely and repeated payments for the rental/lease of furniture from a private business and retaining the furniture in his possession. *Glenn*, 56 Ohio Misc.2d at 1-2. The trial court found him not guilty of theft. *Id*. at 5. In so doing, the court concluded that there was a question of whether rental payments were due and owing and whether this was a sale, which would invoke statutes regarding security agreements and the special established procedural means available to secured parties for the recovery of property. *Id*. at 4-5.

{¶110} In *Howell*, the defendant purchased a truck from a dealership for $17,069.46 on January 10, 1994. *Howell*, 64 Ohio Misc.2d at 25. She made a down payment of $1500.00, filled out the necessary paperwork, and signed a purchase agreement indicating that the agreement was subject to credit approval and that if she was denied credit, she would return the vehicle immediately upon demand. *Id.* She was then given possession of the truck and a thirty-day temporary tag. *Id.* For unknown reasons, she did not give all of the necessary information to the finance company, which did not pay the dealership the remaining amount owed, but she retained the truck until a criminal complaint was filed against her on February 4, 1994. *Id.* She was charged with the offense of the unauthorized use of a vehicle, a felony, and the case came before the municipal court for a probable cause hearing. *Id.* In finding that there was no probable cause to believe a felony had been committed, the municipal court determined that a question existed as to whether Howell had a sufficient claim to ownership and, hence, a legitimate claim to possession, based upon her down payment and belief that the paperwork could be straightened out. *Id.* at 26-30. In making this determination, the Court found that the proper remedies for the dealership were to be found in a civil action rather than criminalizing Howell's actions. *Id.* at 29.

{¶111} Unlike these cases, the case sub judice does not involve a question of whether Gordon was entitled to retain possession of the body armor, car

charger, holster, and polo shirt because of some arguable ownership interest or security agreement involving the issue of late payments. Furthermore, the parties in the cases cited by the majority were given possession of the items in dispute based upon contracts. Gordon did not originally obtain these items according to the employee handbook, as this "contract" (as the majority characterizes it) was signed on January 17, 2006, and all of these items were purchased and issued to the Kalida Police Department prior to this date. Undeniably, when construing the evidence in a light most favorable to the State, Gordon knew that this property belonged to Kalida, not him, and was to be returned to it upon termination of his employment.

{¶112} Moreover, the fact that the employee handbook informed him that Kalida might hold his paycheck until the items were returned does not render this a civil, "election of remedies" matter. There is nothing in the law that requires a victim of this type of offense to choose between a civil action and a criminal action. See 1 Wharton's Criminal Law (14 Ed.1978) 225, Civil or Criminal Action Pending, Section 44 (stating "[w]hen a crime also constitutes a private wrong, the right of the injured individual to bring a civil action to recover damages and the right of the State to prosecute and impose punishment for the crime are separate and independent remedies. Accordingly, the pendency or enforcement of, or the recovery in, one action may not be interposed as a defense in the other

action." (Footnote omitted.)) In fact, there are many occasions where the victim of a crime may institute a civil action against the defendant, who is also facing criminal charges. The choice to indict a criminal offense is that of the State, through the grand jury, who represents all the citizens of the State, not solely the victim. Indeed, a crime victim may not even want a prosecution to proceed, but this decision ultimately lies with the grand jury in felony cases or the prosecution in misdemeanor cases. Thus, the Village of Kalida's employee handbook terms do not dictate the actions of the State of Ohio.[21]

{¶113} The majority also acknowledges that there are times when a theft offense can occur when a party wrongfully retains property that was originally obtained through a contractual agreement (which, as previously indicated, this property was not obtained in a similar manner). The majority then cites a number of cases as examples and concludes that there was no evidence that Gordon's intentions were fraudulent or that he "sold, secreted, or disposed of the property, or that he refused to pay for or return the specific property after being asked." (Maj. Opin. at ¶ 58.) However, the property at issue was only recovered when a

---

[21] I also take exception to the majority's statement that this matter could have been easily remedied by requesting Gordon to pay for the missing items or to return them. Although Gordon said he would have returned them, this matter might not have been "easy" because he could have informed the Village of Kalida that he did not have these items, that they were destroyed, etc. Given that the jury obviously found issues with Gordon's credibility, it is neither accurate nor appropriate for this Court to make such assertions about what Gordon may have done and the ease with which this matter could have been resolved. Furthermore, simply because one who intends to deprive another of property may agree to return this property when his crime is detected, this does not negate the fact that he initially intended to deprive the owner of property.

search warrant was obtained and executed. The property was found in his home, where the authorities would have no right to enter without consent or a warrant. Additionally, Special Agent Justice testified that he told Gordon the following in January of 2008, when he spoke to him about the investigation:

> **I said at the end of everything, I think he was walking out, I said, Forest, if you got any stuff that belongs to Mike [Chief Giblin], get it back, or if the village has given you something, get it in writing that they gave it to you and it is your property. I said if you got anything you might want to give it back.**

(Trial Trans., 1/21/10, Vol. III, p. 71.) Despite this admonition and the fact that he knew he was being investigated by BCI, Gordon did not return any other property belonging to Kalida. Given all of this evidence, including the testimony that he was told to return anything he had belonging to Kalida some two months before the warrant was executed, there was sufficient evidence in this case to find that a theft offense occurred, even when following the rationale of the Hamilton County Municipal Court.

{¶114} Lastly, the majority concludes that the evidence was not sufficient to infer criminal intent on Gordon's part in regards to the Smith and Wesson lease and Officers Weaks and Strick. I disagree with this conclusion in a number of respects.

{¶115} First, while Officers Weaks and Strick believed that this was an affordable plan and Officer Weaks felt he was paying a fair price, their subjective

feelings, without knowing the prices listed for their guns on the Worksheet, are not relevant to whether Gordon deprived them of their property by overcharging them for their monthly payments. Second, their testimony did not confirm Gordon's testimony that they, seemingly together, looked up the prices of the guns on the law enforcement version of the Smith and Wesson website and divided them by eight to determine their quarterly payments for a two-year period. Rather, the officers testified that they, respectively, relied on Gordon for the lease terms and that they, respectively, looked up the list prices for their guns on the internet. They did not say that they looked online with Gordon or that they looked on the law enforcement version of the website.

{¶116} Third, the majority relies on Gordon's testimony that he had not seen the Worksheet as part of the lease agreement prior to the trial and the lack of authentication evidence to show who created the Worksheet or to state whether it was part of the lease agreement sent to Gordon. However, this lease agreement, complete with the Worksheet attached to it, *was admitted into evidence without objection* as State's Exhibit 12. Further, Chief Giblin testified that he contacted Smith and Wesson about the lease upon receiving a bill for a quarterly payment. He then requested that Smith and Wesson send him a copy of the lease that Gordon entered into on behalf of the Kalida Police Department, which it did.

Chief Giblin also testified that State's Exhibit 12, which included the Worksheet, was the lease sent to him by Smith and Wesson.

{¶117} Accordingly, the State did present evidence that could lead a reasonable factfinder to conclude that Gordon would have seen the Worksheet when he entered into the contract and would have known the actual list price of each weapon, including that Officer Strick's gun was listed at $567.00. Officer Strick's payments, had he paid all eight, would have resulted in a total payment of approximately $419.00 above list price.[22] Even at an eight percent interest rate, whether this rate was annual and/or compounded over two years, his payments were greatly in excess of what he should have been paying.

{¶118} Fourth, the majority takes issues with the product code for Stick's gun. The majority notes that on the Worksheet this gun is listed as "Product Code 20747" but that the final lease agreement listed it as "Model No. 204744". The majority acknowledges that there was no explanation concerning the large discrepancy in the price of Officer Strick's gun but speculates that because there was a definite error in the product code number, there might also have been an error in the Worksheet's pricing. However, a reasonable inference could have been made by this jury that this was a typographical error in the number

---

[22] The testimony established that the officers only made five payments before the Village of Kalida discovered the lease agreement and paid the remaining three payments. Therefore, Officer Strick paid a total of $616.35, which was already over the list price for this gun, and Officer Strick still had three payments to make.

-70-

arrangement and not a reason to conclude that there was insufficient evidence that Gordon overcharged Officer Strick. Notably, the "Leasing Information Sheet," which is contained in the lease agreement and outlines the overall agreement, also contains the same product number, 20747, as the Worksheet. Gordon never testified that he had not seen this sheet. Thus, to conclude that a possible typographical error renders the State's evidence insufficient because of pure speculation that the list price could also be incorrect far oversteps our standard of review.

{¶119} Fifth, the majority also computed the charges and concludes that the State's computations are incorrect. In so doing, the majority states that the lease payments were compounded or computed differently. However, the majority's figures also establish overpayments by both officers. Regardless of whether the State's computations were correct, the undisputed evidence remains that the officers were overcharged. Thus, their overpayments for their obligations would have reduced Gordon's payment obligations for his four weapons, which were also figured into the calculation of the total quarterly lease payment of $484.90.[23] Thus, even if the exact amounts are incorrect and did not raise the total theft amount to over $500.00, Gordon's conviction for theft in office should remain as

---

[23] The majority also wonders whether the officers would have discovered the errors and corrected them by the time of the final lease payment if they had the chance. This question is more aptly applied to the weight of the evidence rather than the sufficiency of it. Further, if we are engaging in speculation, the officers may have never realized that Gordon was paying a lesser quarterly amount because of their higher payments because the lease would have simply been paid off with their belief that this was a good deal, and Gordon's benefit from overcharging them would have gone undetected.

the only error would be in the level of the offense, i.e. a fifth degree felony rather than a fourth degree felony.[24]

{¶120} Based on the foregoing, there was clearly sufficient evidence for a rationale trier of fact to find that Gordon knew the list amounts of the individual weapons and the interest rate thereon, knew that he was overcharging the officers, particularly Officer Strick, and used these overpayments with the intention of reducing his quarterly payments, thereby profiting from these officers and depriving them of the overages.

{¶121} In summation, I would find that there was sufficient evidence that Gordon intended to deprive the Village of Kalida of its property and to deprive the officers of their money. However, I agree with the majority that there was not sufficient evidence that the Village of Kalida was deprived of services by Gordon through his online endeavors. Furthermore, I agree with the majority that there are concerns as to whether the aggregate value of the loss is in excess of $500.00. Nevertheless, this issue was not raised by Gordon and there was some evidence of the value of the body armor, holster, and battery charger and of the overpayments,

---

[24] The jury made two specific findings in its jury form. It first found that Gordon was guilty of theft in office in violation of R.C. 2921.41(A)(1). The jury was then told to determine whether the value of this theft was "less than $500.00" or "$500.00 or more and less than $5,000.00." The jury chose the latter, resulting in a fourth degree felony offense.

which together would total in excess of $500.00. In any event, Gordon's conviction should not be reversed, but at most, reduced to a fifth degree felony.[25]

{¶122} For all of the foregoing reasons, I would overrule Gordon's first and second assignments of error and affirm his two convictions for theft in office. Having overruled those assignments of error, I would proceed to address the third assignment of error regarding whether the trial court abused its discretion in ordering that Gordon be sentenced to prison.

/jlr

---

[25] As previously noted, Gordon's primary challenge to his conviction for theft in office in the Kalida property and services case is based upon his argument that the manifest weight of the evidence did not demonstrate that he intended to deprive Kalida and Officers Weaks and Strick of their property. In support, Gordon relies upon his testimony that he did not mean to overcharge the officers and that he forgot he had property in his possession that belonged to Kalida. However, the evidence as outlined above does not support such a conclusion as there is nothing in the record to show that the jury clearly lost its way in resolving conflicts in the evidence. Rather, the jury chose not to believe Gordon's version of events and reached a reasonable conclusion of his guilt given his actions and/or inaction. Thus, although I have chosen to evaluate this case based upon the majority's determination that Gordon was actually challenging his conviction upon legal sufficiency grounds, under either type of challenge, the evidence amply supports his conviction in this case.